Appeal from District Court, Trinity County; S. W. Dean, Judge.

F. W. Gates was convicted of assault with intent to kill, and he appeals. Affirmed.

E. B. Hendricks, Asst. Atty. Gen., for the State.

PRENDERGAST, J. Appellant was convicted of an assault with intent to kill and assessed the lowest punishment.

The evidence was undoubtedly sufficient to sustain the verdict. Every issue raised was submitted by the court in an apt charge, to which there was no objection.

[1, 2] In his motion for a new trial he sought a new trial on the ground of claimed newly discovered evidence. He did not attach thereto the affidavit of the person whose testimony he claimed was newly discovered, and his motion on this ground is wholly insufficient under the well-established law pertaining thereto. However, the court heard the testimony on this ground, and after hearing it overruled the motion. This evidence was attempted to be preserved in both a bill of exception and a statement of facts, but both filed in the lower court after the adjournment of the term; hence this question cannot be reviewed by this court, as has many times been held. Reyes v. State, 196 S. W. 533, and cases there collated.

There is nothing else to discuss. The judgment is affirmed.

---

MILLER v. STATE. (No. 4829.)

(Court of Criminal Appeals of Texas. Jan. 23, 1918.)

1. CRIMINAL LAW ⟺1056(1)—APPEAL—PRESERVATION OF EXCEPTIONS.

Where no exceptions were reserved to the charge before it was read to the jury, the allegation in the motion for new trial that the charge was erroneous cannot be considered.

2. CRIMINAL LAW ⟺958(3) — NEW TRIAL — NEWLY DISCOVERED EVIDENCE—DILIGENCE.

Where accused's brother and sister were very familiar with him, and the brother testified on the trial, accused's motion for new trial on the ground of newly discovered evidence by his sister, showing that he was of weak mind, disclosed no diligence, and was properly denied, since it was a want of diligence to fail to inquire into such matter on the trial.

Appeal from Criminal District Court, Harris County; C. W. Robinson, Judge.

Dick Miller was convicted of murder, and he appeals. Affirmed.

E. B. Hendricks, Asst. Atty. Gen., for the State.

DAVIDSON, P. J. Appellant was convicted of manslaughter, his punishment being assessed of five years' confinement in the penitentiary.

[1] There were no exceptions reserved to the charge before same was read to the jury. In the motion for new trial it is alleged that the court's charge, in reference to intoxication as a defense, was erroneous, in that it only gave part of the statute. As presented it cannot be considered, but we are of opinion, even if it was, there is no error in the charge as applicable to the facts of the case.

[2] The motion for new trial alleges newly discovered testimony. The motion is not sworn to by the defendant or his attorneys, and there is nothing in the motion to show that appellant was not aware of the facts set up as newly discovered evidence. The sister of defendant files an affidavit to the effect that her brother, the defendant, was of a weak mind, and especially when under the influence of intoxicants he would not know what he was doing. This evidently was known to not only defendant and his counsel, but the family connection, before the trial. The brother of appellant took the witness stand and testified in regard to the conduct and actions of his brother on the night of the homicide, and his testimony shows great familiarity with defendant and his conduct and movements even on the night of the homicide. The defendant took the witness stand and testified intelligently, but denied that on the particular night of the homicide, after a certain time, he recollected anything; that his mind was rather a blank from a certain time to a certain time, the interregnum covering the time that he had the difficulty with deceased. His brother testified with reference to the acts and conduct of the defendant on the night just prior to the homicide. There is also evidence to the effect that defendant was drinking, but all those facts were known to the defendant and his brother and to counsel, because counsel who defended placed these witnesses on the stand, as well as defendant himself. If defendant's mind was affected as stated by the sister, this was evidently known to the interested parties, and was known to counsel, because that was one of the phases of the defensive theory. Slight diligence would have manifested the fact that if his mind was of that character, or under certain circumstances would be placed in the condition asserted by the affidavit of the sister, the slightest diligence would have discovered that, and it was a want of diligence to fail to inquire into these matters. There is no merit in the motion for new trial on this phase of it.

The judgment will be affirmed.

---

FRANKLIN v. STATE. (No. 4799.)

(Court of Criminal Appeals of Texas. Jan. 23, 1918.)

HOMICIDE ⟺234(1)—GUILT—SUFFICIENCY OF EVIDENCE.

In a prosecution for wife murder, evidence *held* to show guilt.

---

Appeal from District Court, Hardin County; J. Llewellyn, Judge.

James Franklin was convicted of murder, and he appeals. Affirmed.

E. B. Hendricks, Asst. Atty. Gen., for the State.

PRENDERGAST, J. Appellant was convicted of the murder of his wife, Willie Franklin, and assessed the death penalty.

There is but one question to be determined, and that is whether the evidence was sufficient to sustain the verdict. The statement of facts is somewhat voluminous, but it has been read and studied carefully more than once. Of course, all of the testimony cannot be given in this opinion. Only some of the material facts and conclusions to be drawn from the evidence will be given. Appellant himself testified and denied many of the incriminating facts testified to by other witnesses against him. The issues raised were all submitted to the jury by the charge of the court in an apt and correct charge. No attack is made on the charge in any particular. The evidence of appellant's guilt was wholly circumstantial. The court so told the jury, and gave them a correct charge on circumstantial evidence.

Appellant and his wife lived at Silsbee in Hardin county for some time before October, 1916. He was an employé of the Santa Fé Railway Company, and worked on its running trains. About October 1st, when he was away from home, his wife quit him and left Silsbee to parts unknown by him. He thought and believed she had quit him and run off with another man. She claimed that she quit him because of his ill treatment of her. Soon after she quit him he began inquiring around among their acquaintances at Silsbee for her and trying to ascertain where she had gone. Among others, he inquired of T. Bonner for her on October 5, 1916. Bonner told him he did not know where she was, and asked him why he wanted to know. Bonner swore:

"He said, 'That G——d d——n bitch is gone, and I asked everybody around Silsbee where she is at and nobody knows.' He says, 'When I find her, everybody is going to know it.' He said if he ever finds her he was going to kill her."

Norma Ross swore:

That after his wife left him she heard appellant make a statement about her. "He said he was going to get his revenge if it took him fifteen years from that date."

Matt Wilson swore: That appellant had a conversation with him about his wife leaving him. The witness advised him to let her go and stay on his job, but appellant said, "I want my revenge." That two or three days after that the witness met him again, and he asked about a fortune teller at Beaumont, and the witness asked him if he had not dropped that thing yet, and appellant replied:

"No, I ain't dropped it. He says, 'No, I ain't going to let it go, by God. I am going to get my revenge.'"

Sam Schackelford swore that he saw appellant at the depot, and appellant told him his wife had run off, and he was going off to hunt her. The witness advised him to let her go; that if she did not want to live with him he certainly ought not to want to live with her. He swore:

"He says, 'God d——n her, I will kill her if I ever find her.' Just that very way. I said, 'You are fixing to get in the penitentiary; that's what you are fixing to do.' He said, 'Well, I don't give a damn what they do with me, just so I find her.' That was just a few days before he went to Orange after her."

The testimony by himself and others shows that he finally located her at Orange, and went after her about October 18th. He found her there and induced her to leave there with him for Silsbee. He swore that he slept with her that night and the next night at Beaumont. He went from Orange on the train with her to Beaumont. On the morning of October 21st he left Beaumont with her on a Santa Fé train going towards Silsbee. He himself swore that they went from Beaumont on the train together until they reached the little station Fletcher, five miles from Silsbee. He swore that just before reaching Fletcher he went into the toilet to put on a collar and tie, and that when he came out of the toilet, after the train reached Fletcher, his wife got off the train with a strange negro man, and he could never find her, and never saw her thereafter; that he got off of the train at Fletcher, and after hunting and inquiring for her from all quarters, and waiting there for some length of time he then went to Silsbee alone afoot. This tale by him of his wife's escape from him was so unreasonable no one could believe it under the circumstances, but, as will be stated later, he made plain contradictory statements about the matter which would show that this tale by him was false.

Mr. Harritt, the engineer on said train from Beaumont, on which appellant and his wife traveled to Fletcher, swore that he knew appellant. (Appellant also swore that Mr. Harritt knew him.) He swore:

"I didn't see him step off the train, but I saw him in company with a colored woman coming from the rear of the train on this side." That when he pulled the train up and stopped at Fletcher for persons to get on and off and while waiting there is when he saw him on this occasion. He did not know the woman who was with appellant; he did not know appellant's wife.

He further swore:

"The last time I saw her was when I passed between the station at Fletcher and the tram crossing. They hadn't quite got to the tram crossing, I don't think, when I passed them there. They were still going in the direction of Silsbee, and that is the last I saw of them."

Mr. J. H. Adams and Ed. Crystal both testified that they were working on the public road which ran from Fletcher to Silsbee and

parallel with the railroad which was not far from Fletcher. Both swore that on said date they saw appellant coming from towards Fletcher going towards Silsbee with a negro woman with him. Both of them knew appellant, but neither knew his wife.

Warren Samuels, the section foreman of the railroad, working on it about halfway between Fletcher and Silsbee on said date, and James McKinney, one of his section hands, both swore that at the noon hour that day appellant came to them alone carrying a grip and a bundle of clothes; that he tried to get them to take him to Silsbee, but they refused. At the time they both swore that his pants was all full of beggar-lice, "little old things that stick on you when you go through the woods and the fields," and that he came from the direction of where the body of his wife was later found. Mr. Samuels further swore that about November 1st he next saw appellant at Silsbee, and that appellant called him off and had a private talk with him, and appellant told him not to tell any one about him passing him down there that day. The witness said he asked him why, and he replied:

"They had had hell on the train with the conductor, the reason he was walking, and he didn't want to lose his job."

He also told him to post his men and tell them not to say anything about seeing him when he passed there; and that while he knew Willie Franklin, appellant's wife, that he never saw her thereafter.

Shug Moses, a woodchopper, swore that on said date while he was chopping wood between Silsbee and Fletcher, that appellant came to where he was cutting wood; that he was carrying a grip and a bundle; that he also noticed that appellant had these old beggar-lice all over his clothes; that he was carrying a pair of woman's shoes across his shoulder and under his coat, which he was also carrying on his shoulder; the shoes were tied together with a string across his shoulder; that the coat hid the shoes. He said he would not have discovered the shoes on his shoulder, as they were covered up, but for the fact that he took them all off and put them down on the ground. It was then that he saw the shoes. It was further shown by this witness and others also that about November 1st, when the body of appellant's wife was found in the woods some 200 yards from the railroad track in a secluded place some mile or two from Fletcher, that appellant's trunk was searched, and this pair of shoes was found in it still tied together as he had carried them as told by the woodchopper. Appellant himself admitted that he put these shoes in his trunk, and they were his wife's shoes. Said Bonner testified that he saw appellant again on October 25th; that he talked to appellant about his wife, and he swore:

"He told me he brought his wife back from Orange as far as Fletcher. He said, 'The G——d

d——n bitch jumped off the train and out run me, and I couldn't catch her, and got away from me.'"

Leonard Anderson and appellant both swore that Anderson was at Orange when appellant went there and got his wife. Anderson swore he returned to Silsbee about a week later, and that he saw appellant at Silsbee, and asked him where his wife was. He swore: "He [appellant] said she was gone home, to Arkansas, he said." Said witness, Matt Wilson, swore that he saw appellant soon after he had returned from Orange, and asked him if he found his wife there. Appellant told him he had. He swore:

"I said, 'You bring her back?' He says, 'I brought her back as far as Fletcher. She came as far as Fletcher, and jumped off the train.' He said, 'When I come out of the toilet,' he said, 'the train was running so fast I couldn't get off of it.' He said, 'I just let her go.' I said, 'The best thing you could do to let her go.' He said he just decided to let her go; he wasn't going to have any more to do with her at all."

Said Schackelford swore that he saw appellant a few days after he came back from Orange, and he asked him if he found his wife, and he said he had; that he had found her at Orange. He swore:

"I said, 'Did you bring her back with you?' He said, 'No, the damn bitch jumped off in Beaumont and give me the dodge, and I couldn't find her any more.' He made no further statements to me at any time about the case."

It was shown that appellant's wife was never again seen alive after appellant came out of the woods with the beggar-lice on his clothes and saw and talked with the section boss and his section hand, and the woodchopper and others. About a week later persons who had known his wife and of the circumstances about him bringing her back as far as Fletcher and getting off there with her began to hunt the woods between Fletcher and Silsbee for her body. About November 1st said Bonner and Matt Wilson both testified that they together went in said woods and hunted for her body; that they found it in a secluded place about 200 yards from the railroad track between Fletcher and Silsbee, the direction from which the section hands saw him coming on October 21st. The question of the identity of this body with that of the deceased was controverted. Bonner swore positively to her identity. Others identified her from her clothing and hat. As soon as the body was found the justice of the peace was notified. He went to it, examined it, and he and Bonner particularly swore that her throat had been cut. They more especially examined her body closer than any of the other witnesses. Her body had begun to decompose; maggots were working in different places in her body, and the stench from it was very great and sickening to many of them, hence they did not get so close to the body. When the body was found, the witnesses swear there were no shoes on the feet; that there was an old pair of lowheeled slippers sitting on the

ground by her body. Hattie Brown swore that before deceased went to Orange on said occasion she let deceased have her hat, and the deceased wore it when she left. This hat was found by the side of her body and thoroughly identified as the hat of Hattie Brown which deceased had worn off and back from Orange. The body was buried right beside where it was found. It was not taken away. Said section foreman Samuels swore that when appellant came to where he and his section hand were, as above related, with the beggar-lice on him, he came from the direction of where said body was later found.

It is unnecessary to recite the testimony further. The whole of it was ample to show appellant's guilt, and that he and he alone had murdered his wife.

The judgment will therefore be affirmed.